UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

RANDAL ANDERSON,

                                    NO. CIV. S-06-2813 FCD GGH

        Plaintiff,

    v.                              <u>MEMORANDUM AND ORDER</u>

UNION PACIFIC RAILROAD
COMPANY, and Does 1 through
25, inclusive,

        Defendants.

----oo0oo----

    This matter is before the court on a motion for summary

judgment, or alternatively, partial summary judgment brought by

defendant Union Pacific Railroad Company ("defendant" or "Union

Pacific") pursuant to Rule 56 of the Federal Rules of Civil

Procedure.  Plaintiff Randal Anderson ("plaintiff" or "Anderson")

opposes the motion.  For the reasons set forth below,[1]

defendant's motion for summary judgment is GRANTED.

---

    [1]  Because oral argument will not be of material
assistance, the court orders these matters submitted on the
briefs.  E.D. Cal. Local Rule 78-230(h).

1

**BACKGROUND**[2]

In 1996, Randal Anderson began his employment with Union Pacific's predecessor, Southern Pacific Transportation Company. (RUF ¶ 1).  In 2006, Anderson was a supervisory special agent (lieutenant) for the Union Pacific Police Department and was assigned to Redding, California. (RUF ¶ 11).  He was responsible for a large territory, which included seven counties in the northern part of California. (RUF ¶ 12).  He was the only police officer assigned to that territory and was handling calls 24 hours a day, 7 days a week. (RUF ¶ 13).  His duties were general law enforcement, such as making arrests and conducting investigations, and he also acted as an instructor for both Union Pacific employees and other law enforcement agencies. (RUF ¶ 14).

### 1.   Employment Status

At all times since Anderson joined the Police Department in May 1996, the policy of the Southern Pacific Police Department and the Union Pacific Police Department has been an at-will employment policy. (RUF ¶ 2).[3]  The employment application that Anderson signed expressly stated that a non-collective bargaining unit employee could be terminated at any time with or without

---

[2]   Unless otherwise noted, the court finds the following facts undisputed. (See Pl.'s Response to Def.'s Stmt. of Undisputed Material Facts ("RUF"), filed Apr. 14, 2008). Plaintiff admits that the underlying facts in this case are not in dispute. (Pl.'s Opp'n to Def.'s Mot., filed Apr. 14, 2008, at 19:3).  Where the facts are in dispute, the court recounts plaintiff's version of the facts. (See Pl.'s Additional Material Facts ("AMF"), filed Apr. 14, 2008).

[3]   While plaintiff seemingly argues to the contrary in his opposition, he does not dispute this fact or cite to any evidence that contradicts this assertion. (RUF ¶ 2).

cause and that no statements, policies, or procedures could modify the at-will employment relationship or create an implied contract of employment for a definite period. (RUF ¶ 3; Ex. A to Decl. of James M. Schiffman ("Schiffman Decl."), filed Mar. 25, 2008). Anderson was not a collective bargaining unit employee and was subject to the at-will employment policy. (RUF ¶ 4).

When Union Pacific and Southern Pacific merged, Anderson was never told that his employment status changed or that he was no longer an at-will employee. (RUF ¶ 5). He did not sign another employment application, and no one ever made any representations to him that his employment status was anything other than at-will. (RUF ¶ 6).

Until January 2006, the Police Department had a written discipline policy, which set forth guidelines for correcting deficient performance and for formal discipline. (RUF ¶ 7). Under the section titled "Formal Discipline," the policy provided that the Regional Director may recommend suspension without pay for just cause and that the General Director may dismiss a department member at any time for just cause. (Ex. B to Decl. of Tania B. Rose in Supp. of Opp'n ("Rose Decl."), filed Apr. 14, 2008, at UP000053-54).[4] The Police Department did not consider the existence of the written discipline policy to abrogate the

_____

[4]     Defendant objects to this evidence for lack of authentication. However, plaintiff's counsel asserts that these documents were produced by defendant during the course of discovery, and defendants do not contest their authenticity. See Maljack Prod., Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 889 n.12 (holding that the district court did not err in considering documents produced by the defendant during discovery where the defendant did not contest their authenticity). Defendant's objection is OVERRULED.

Police Department's ability to terminate employees without cause
pursuant to the existing at-will policy.  (RUF ¶ 8).[5]  In January
2006, the Union Pacific Police Department made revisions to its
written policy manual and changed the name of Policy No. 3.4.1,
"Discipline," to "At Will Employment."  (RUF ¶ 9).  The revisions
to the written policy manual were not intended to be a change in
Union Pacific's policies, but were made in order to make the
Police Department's written policy manual consistent with the
company's at-will employment policy.  (RUF ¶ 10).[6]

>    **2.   The Underlying Conduct**

In January 2006, Union Pacific paid for Anderson to travel
and stay in Omaha, Nebraska for three days for work-related
meetings.  (RUF ¶ 15).  On his last night in Omaha, Anderson
arranged to meet with employees of Union Pacific's Response
Management Communication Center ("RMCC"), whom he had spoken to
by telephone.  (RUF ¶ 16).  He contacted Jessica Hamilton, a
dispatcher at the RMCC.  (RUF ¶ 17).  Around 10:00 p.m., Hamilton
returned his call and told him she would pick him up at his
hotel.  (RUF ¶ 18).  Hamilton picked Anderson up, and they met
another dispatcher from RMCC, Jill Meyer.  (RUF ¶ 19).  Anderson,

---

[5]     Plaintiff objects to this evidence for lack of
foundation.  However, this assertion was made by James Schiffman,
the Director of Police Operations for defendant.  (Schiffman
Decl. ¶¶ 1, 3).  Schiffman declared that as Director of Police
Operations, he is responsible for overseeing the development of
policies for the Police Department.  (Id. ¶ 2).  As such, he is
qualified to testify about the interpretation of Police
Department policy regarding disciplinary procedures and at-will
employment status.  Plaintiff's objection is OVERRULED.

[6]     Plaintiff again objects to this evidence for lack of
foundation.  For the reasons set forth, supra n.4, plaintiff's
objection is OVERRULED.

1  Hamilton, and Meyer went to a sports bar for drinks.  (RUF ¶ 19).

2       According to Hamilton and Meyer, Anderson used sexual

3  innuendos during their conversations and invited them back to his

4  room, which made them feel uncomfortable.  (RUF ¶ 20).  Anderson

5  admits that he spoke to them about his relationship with his wife

6  and that sexual banter took place.  (RUF ¶ 21).  During the

7  course of their conversations, Hamilton raised the issue that she

8  was a lesbian.  (RUF ¶ 9).  Hamilton asked Anderson if Andrea

9  Young, a co-worker of Anderson's, was homosexual.  (AMF ¶ 10).

10  Anderson responded that he didn't know, but thought that she

11  might be bisexual.  (AMF ¶ 10).  After the bar closed, Hamilton

12  drove Anderson around, including by her apartment.  (AMF ¶ 11).

13  Thereafter, Anderson told her to take him back to his hotel

14  because it was getting late.  (AMF ¶ 11).

15       The next day, Anderson called Hamilton and apologized about

16  their "off color" conversation.  (RUF ¶ 23).  Within a week or

17  two thereafter, Hamilton communicated with Anderson by telephone

18  and by e-mail.  (AMF ¶ 12).

19       In early February 2006, Hamilton spoke to another special

20  agent, John Larkin, about her meeting with Anderson.  (RUF ¶ 24).

21  She told Larkin what Anderson had said about Young's sexual

22  orientation.  On March 6, 2006, during Advanced Officer Training

23  ("AOT") in Ontario, Larkin told Young that there was a rumor

24  going around, started by Anderson, that she was bisexual.  (RUF ¶

25  25).

26       On March 7, 2006, while still at AOT in Ontario, Anderson

27  and another male police officer walked over to where Young and

28  two other female officers were talking.  (RUF ¶ 26).  Anderson

5

said, "Is this a girls' meeting?" (RUF ¶ 27).  One of the female
officers replied, "No dicks allowed." (RUF ¶ 27).  In response,
Anderson said, "Why are you still here, Andrea?" (RUF ¶ 27).
Young became upset and walked away. (RUF ¶ 28).

On March 8, 2006, Young confronted Anderson about the rumor.
(RUF ¶ 29).[7]  Young approached Anderson and asked him if he
wanted a mouth full of teeth, indicating that she wanted to punch
him. (AMF ¶ 14; Anderson Decl. ¶ 12).  When asked why she was
upset, Young replied that she had heard about his comment that
she might be or was bisexual. (AMF ¶ 14).  Anderson replied by
asking Young who told her about the comment. (RUF ¶ 30).
Anderson admitted that it was his opinion that Young could be
gay. (RUF ¶ 30).

Later that day, Anderson asked to speak to Young about the
matter. (RUF ¶ 32).  Anderson apologized to Young, but told her
that he was going to continue thinking of her as bisexual. (RUF
¶ 32; Decl. of Randal Anderson ("Anderson Dep."), Ex. 3 to Decl.
of Stephanie L. Quinn in Supp. of Def.'s Mot. ("Quinn Decl."),
filed Mar. 25, 2008, at 83:23-24, 85:22-23).  Anderson told Young
that his father was homosexual and that "it just didn't carry
much weight" because he was so accustomed to different sexual
orientations among people to whom he was close. (Anderson Decl.
¶ 15).  Young returned to her room; she was very upset and way
crying. (RUF ¶ 33).  Anderson went to the room of John Allen,

---

[7]     There appears to be some dispute regarding whether the
confrontation occurred on March 8 or March 9.  (Compare RUF ¶ 29
with Decl. of Randal Anderson in Supp. of Opp'n ("Anderson
Decl."), filed Apr. 14, 2008, ¶ 12).  However, such dispute is
immaterial to the merits of this case.

his supervisor, and asked whether he wanted to know what had
happened.  (Anderson Decl. ¶ 16).   Allen advised Anderson that he
did not want to speak about it at that point; nothing was
discussed about the matter for the remainder of the evening.
(Anderson Decl. ¶ 16).

On March 12, 2006, Young made a complaint of sexual
harassment by Anderson over the telephone to Union Pacific's
Equal Employment Opportunity ("EEO") Hotline.  (RUF ¶ 34).   She
alleged that Anderson told someone he thought she was bisexual
and that he made inappropriate comments to her.  (RUF ¶ 34).
Union Pacific's EEO policy prohibits offensive behavior and
statements directed at a person's gender, sexuality, or other
protected status.  (RUF ¶ 35).   It is Union Pacific's policy to
investigate all EEO complaints.  (RUF ¶ 36).   The complaint was
processed by Union Pacific's EEO Department, who provided the
complaint to the Police Department for investigation.  (RUF ¶
37).   The Chief of Police, Dennis Jenson, initiated an
investigation into the allegations.  (RUF ¶ 38).   He assigned
primary responsibility for conducting the investigation to Deputy
Chief George Slaats, who is in charge of police operations for
Union Pacific in California.  (RUF ¶ 39).

Slaats interviewed 12 employees, including Young and
Anderson.  (RUF ¶ 40).   He obtained written statements from the
witnesses and prepared summaries of each interview.  (RUF ¶ 40).
During his interview with Young on March 13, 2006, Slaats learned
that when Young confronted Anderson about the rumors regarding
her sexuality, Anderson did not deny that he had made a comment
and told her that he was keeping to his opinion that she was gay.

7

(RUF ¶ 41).  Slaats also learned from Young that Anderson made inappropriate comments to her in front of her co-workers during training.  (RUF ¶ 42).

Slaats interviewed Anderson on March 14, 2006.  (RUF ¶ 43). Slaats thought Anderson's demeanor was very defensive.  (RUF ¶ 43).  During the interview, Anderson tried to bring up what Young had said or done in the past; Anderson had never previously complained about Young or filed an EEO complaint about her.  (RUF ¶ 44).  Anderson admitted that he had responded to the "no dicks" comment with "why are you still here?" directed at Young.  (RUF ¶ 46).

During the interview on March 14, Slaats directed Anderson that he was not to discuss the investigation with anyone.  (RUF ¶ 49).[8]  Subsequently, Anderson contacted Jennifer Johnson, another co-worker, telling her about the EEO complaint and that she was named in the complaint.  (RUF ¶ 51).  Johnson told Slaats about this contact at her interview on March 16, 2006.  (RUF ¶ 50). Slaats also learned that after his interview, Anderson attempted to contact Hamilton and Meyer at the RMCC.  (RUF ¶¶ 52, 55, 57-59).

Slaats interviewed Anderson again on March 22, 2006, and asked him whether he had contacted anyone and discussed the

---

[8]   Plaintiff asserts that this fact is disputed because Anderson interpreted Slaat's statement as an instruction not to discuss the interview or what was discussed.  (Anderson Decl. ¶ 17).  However, in his deposition, plaintiff testified that he understood this directive to mean that he was no to discuss *the investigation or the interview*.  (Anderson Dep. at 113:5-7).  "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  Kennedy v. Allied Mutual Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991).

1   investigation.  (RUF ¶ 60).  Anderson admitted that he attempted
2   to contact Hamilton to find out what she and Meyer had said.
3   (RUF ¶ 16).

4        Slaats briefed Jenson on the interviews he conducted and
5   provided him with written summaries of the interviews and the
6   witness statements.  (RUF ¶ 62).  Slaats advised Jenson that he
7   believed termination was appropriate and justified.  (RUF ¶ 63).
8   Jenson made the ultimate decision to terminate plaintiff's
9   employment.  (RUF ¶ 63).  Jenson was concerned about how Anderson
10  treated the women from RMCC and whether he could maintain the
11  professional standards of a police officer.  (RUF ¶ 64).  Jenson
12  determined that Anderson's comments regarding Young were
13  inappropriate and that Anderson's dealings with Young showed
14  insensitivity on his part.  (RUF ¶ 65).  Jenson believed that
15  Anderson's conduct violated Union Pacific's EEO policy.  (RUF ¶
16  66).  Jenson also believed that Anderson's contacting of
17  witnesses was in direct violation of Slaat's directive.  (RUF ¶
18  68).

19       Jenson made his decision to terminate Anderson's employment
20  on March 20, 2006, but waited to notify him so that additional
21  investigation could be conducted into the allegations that
22  Anderson had contacted witnesses during the investigation.  (RUF
23  ¶ 69).  Jenson directed James Schiffman, Director of Police
24  Operations, to draft a termination letter to Anderson, which was
25  provided to Slaats for review as early as March 22, 2006.  (RUF ¶
26  72).  After Slaat's follow-up interview with Anderson on March
27  22, 2006, Jenson believed that Anderson's conduct amounted to
28  insubordination and was further cause to terminate his

9

1  employment.  (RUF ¶ 70).

2      On March 23, 2006, Slaats received a voicemail message from

3  Tania Rose, stating that she was representing Anderson and asking

4  Slaats to call her.  (RUF ¶ 73).  The following day, Slaats

5  received an e-mail message from Rose.  (RUF ¶ 74).  Prior to Rose

6  contacting Slaats on March 23, 2006, Anderson had not told anyone

7  at Union Pacific that he hired an attorney or was represented by

8  legal counsel.  (RUF ¶ 75).

9      On March 24, 2006, Slaats met with Anderson and advised him

10  that his employment had been terminated.  (RUF ¶ 78).  Slaats

11  provided Anderson with Jenson's termination letter.  (RUF ¶ 78).

12      **3.  The Litigation**

13      On October 12, 2006, plaintiff filed an action in the

14  Superior Court of California for the County of Shasta, alleging

15  (1) breach of implied contract; (2) breach of the implied

16  covenant of good faith and fair dealing; and (3) wrongful

17  termination in violation of public policy.[9]  (Compl., filed Dec.

18  11, 2006).  On December 11, 2006, defendants removed the case to

19  this court on the basis of diversity jurisdiction.

20                              **STANDARD**

21      The Federal Rules of Civil Procedure provide for summary

22  judgment where "the pleadings, depositions, answers to

23  interrogatories, and admissions on file, together with the

24  affidavits, if any, show that there is no genuine issue as to any

25  material fact."  Fed. R. Civ. P. 56(c); see California v.

26  Campbell, 138 F.3d 772, 780 (9th Cir. 1998).  The evidence must

27  _____

28      [9]   Plaintiff also pled a claim for defamation.  However,
    the parties subsequently stipulated to dismissal of this claim.

                                  10

be viewed in the light most favorable to the nonmoving party.
See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en
banc).

The moving party bears the initial burden of demonstrating
the absence of a genuine issue of fact.  See Celotex Corp. v.
Catrett, 477 U.S. 317, 325 (1986).  If the moving party fails to
meet this burden, "the nonmoving party has no obligation to
produce anything, even if the nonmoving party would have the
ultimate burden of persuasion at trial."  Nissan Fire & Marine
Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000).
However, if the nonmoving party has the burden of proof at trial,
the moving party only needs to show "that there is an absence of
evidence to support the nonmoving party's case."  Celotex Corp.,
477 U.S. at 325.

Once the moving party has met its burden of proof, the
nonmoving party must produce evidence on which a reasonable trier
of fact could find in its favor viewing the record as a whole in
light of the evidentiary burden the law places on that party.
See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th
Cir. 1995).  The nonmoving party cannot simply rest on its
allegations without any significant probative evidence tending to
support the complaint.  See Nissan Fire & Marine, 210 F.3d at
1107.  Instead, through admissible evidence the nonmoving party
"must set forth specific facts showing that there is a genuine
issue for trial."  Fed. R. Civ. P. 56(e).

/////

/////

/////

11

**ANALYSIS**

**A.   Breach of Implied Contract**

Plaintiff claims that during the entire course of his employment with defendant, there was an implied in fact employment contract between plaintiff and defendant, which at the time of plaintiff's termination included terms that (1) plaintiff would be able to continue his employment with defendants so long as he carried out his duties in a proper and competent manner; (2) plaintiff would not be demoted, discharged, suspended, or otherwise disciplined without good cause and without a full and fair investigation; and (3) defendant would not evaluate plaintiff's performance in an arbitrary, untrue, or capricious manner.  (Compl. ¶ 18).  Plaintiff alleges that defendant breached this implied contract by terminating his employment without cause.  (Compl. ¶ 22).  Defendant asserts that plaintiff signed an express contract, which provided that his employment with defendant was at-will and that no conduct could modify that status.  Thus, defendant contends that there was no such implied contract.

**1.   Express Written Agreement**

A clear and unambiguous at-will provision in a written employment contract, signed by the employee, cannot be overcome by evidence of a prior or contemporaneous implied contract requiring good cause for termination.  <u>Dore v. Arnold Worldwide, Inc.</u>, 39 Cal. 4th 384, 389 (2006).  Under California law, an employment application completed and signed by an employee that expressly states that employment is terminable at-will also qualifies as such an agreement.  See <u>Gianaculus v. Trans World</u>

1  Airlines, Inc., 761 F.2d 1391, 1394 (9th Cir. 1985) (holding that
2  an employee's claim for breach of an implied contract was
3  precluded where the employee had signed an employment application
4  with an express at-will provision).

5      In this case, it is undisputed that plaintiff signed an
6  employment application when he was hired by defendant Union
7  Pacific's predecessor, Southern Pacific, which unequivocally
8  provided that he was an at-will employee.  The application
9  expressly stated that he could be terminated at any time, with or
10 without cause, and that no statements, policies, or procedures
11 could modify the at-will employment.  It is also undisputed that
12 after Union Pacific and Southern Pacific merged, Anderson was
13 never told that his employment status changed, he was never asked
14 to sign another employment application, and no representations
15 were made that his employment status was anything other than at-
16 will.  Therefore, because plaintiff completed and signed an
17 employment application with an express at-will provision and
18 because there was no indication that this agreement was altered
19 after the merger between Southern Pacific and Union Pacific,
20 plaintiff's claim that there was an implied contract is
21 precluded.

22      **2.   Implied Contract**

23      However, even assuming that plaintiff argued that the
24 original employment application does not constitute an express
25 contract between Anderson and Union Pacific,[10] plaintiff has
26 failed to raise a triable issue of fact that he has rebutted the

27 _____

28      [10]   Plaintiff does not expressly make such an argument or
cite to any cases in support thereof.

statutory presumption of at-will employment.  Under California law, there is a statutory presumption that an employment relationship that has no specified term "may be terminated at the will of either party on notice to the other."  Cal. Labor Code § 2922 (2008); Schneider v. TRW, Inc., 938 F.2d 986, 990 (9th Cir. 1991).  "An employee may overcome this presumption with evidence of contrary intent."  Schneider, 938 F.2d at 990 (citing Foley v. Interactive Data Corp., 47 Cal.3d 654, 677 (1988)).  The plaintiff must produce competent evidence of an agreement with his employer that he could not be discharged without good cause. Eisenberg v. Alameda Newspapers, Inc., 74 Cal. App. 4th 1359, 1387 (1999).  In evaluating whether there was contrary intent, courts consider the entire relationships of the parties, including the (1) terms of the application for employment; (2) the personnel policies or practices of the employer; (3) the practices of the industry in which the employee is engaged; (4) actions or communications by the employer reflecting assurances of continued employment; and (5) the employee's longevity of service.  Schneider, 938 F.2d at 990; Foley, 47 Ca.3d at 677; Eisenberg, 74 Cal. App. 4th at 1387.

     The existence of an implied promise to discharge an employee only for good cause is generally a question of fact for the jury. Eisenberg, 74 Cal. App. 4th at 1386.  Where the facts are undisputed, the issue of the existence of an implied contract may be resolved as a matter of law.  Id.

     As set forth above, the employment application completed and signed by plaintiff expressly provided that he was an at-will employee who could be terminated with or without cause.  There is

14

no evidence that Union Pacific altered this agreement after the
merger with Southern Pacific.  Further, the Director of Police
Operations declared that at all times since Anderson's employment
with the Police Department in May 1996, the Police Department's
employment policy has been an at-will employment policy.
(Schiffman Decl. ¶ 3).

Plaintiff argues that there is an industry-wide practice of
terminating peace officers only for cause, which weighs in favor
of finding an implied contract in this case.  Plaintiff asserts
that as a general matter, public safety officers are entitled to
certain rights pursuant to statute with respect to their
employment and termination.  <u>See</u> Cal. Gov't Code §§ 3300 et seq.
Plaintiff contends that this standard is evidence of an industry-
wide practice and should be applied to plaintiff as a railroad
officer.  However, plaintiff concedes that these statutory
provisions explicitly do not apply to railroad officers.  (Opp'n
at 16).  Therefore, plaintiff has failed to present any evidence
that there is an industry-wide practice regarding limiting
termination of railroad officers based upon just cause.[11]

Significantly, plaintiff fails to offer *any evidence* of an
actual promise that he would be employed for a specific term or

---

[11]   In support of his contention that defendant had a
policy of terminating employees only for good cause, plaintiff
argues that Slaats testified in his deposition that in the last
ten years, three police officers had been terminated, and there
was good cause to do so in each case.  Plaintiff cites to "AMF
***" to support this argument.  There is no fact relating to any
prior terminations in plaintiff's statement of additional
material facts.  Moreover, plaintiff does not include the
deposition testimony of Slaats in the evidence supporting his
opposition.  Therefore, because there is no evidence in support
of this argument, the court cannot properly consider it.

as long as he was doing a good job, or that he could only be
terminated for good cause.  <u>See</u> <u>Eisenberg</u>, 74 Cal. App. 4th at
1389 (holding that summary judgment for the defendant employer
was appropriate where the plaintiff employee failed to proffer
any evidence that anyone told him he would have job security or
could not be terminated without cause).  Rather, plaintiff's sole
evidence relating to modification of his employment status is a
written discipline policy, which set forth a progressive
discipline system and provided that the Regional Director may
recommend suspension without pay for just cause and the General
Director may dismiss a department member at any time for just
cause.[12]  However, the existence of a disciplinary process does
not rebut the presumption of at-will employment status.  <u>Davis v.</u>
<u>Consolidated Freightways</u>, 29 Cal. App. 4th 354, 367-68 (1994)
(holding that the defendant's use of techniques to encourage
compliance, other than immediate termination, did not demonstrate
that the at-will employment status had been modified and stating
that to hold otherwise would force an employer "to terminate
employees for any and every infraction – or none at all – in
order to maintain the presumption of at-will employment").
Moreover, this disciplinary process was not inconsistent with an
at-will employment policy.  Rather, the undisputed evidence
demonstrates that in January 2006, prior to plaintiff's

---

[12]    Plaintiff contends that this policy stated that
dismissal was "for cause."  This contention mischaracterizes the
evidence.  The written policy provided that an officer could be
dismissed for cause under certain circumstances; nothing in the
written discipline policy or any other evidence proffered by
plaintiff provided that an officer could only be dismissed for
cause.

termination, defendant clarified that the disciplinary process did not modify the at-will employment policy by renaming the written disciplinary policy "At Will Employment."  Therefore, plaintiff's proffered evidence is insufficient to raise a triable issue of fact regarding whether the statutory presumption of at-will employment was rebutted.

Finally, while plaintiff's eleven years of employment as a police officer may be relevant to the existence of an implied contract, the California Supreme Court has expressly stated that "an employee's *mere* passage of time in the employer's service, even where marked with tangible indicia that the employer approves the employees work, cannot *alone* form an implied-in-fact contract that the employee is no longer at will." Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 341-42 (2000) (emphasis in original).  In this case, (1) the employment application signed by plaintiff expressly provided that plaintiff's employment status was at-will and could not be modified; (2) the Director of Police Operations testified that defendant has always had an at-will employment policy; (3) there was no industry wide practice that limited termination of railroad officers employment to just cause; (4) there was no statement made by any of plaintiff's supervisors or defendant's agents indicating that plaintiff's employment status had changed; and (5) the discipline policy that was, at most, ambiguous was revised prior to plaintiff's termination to clarify that a progressive disciplinary structure did not modify the at-will employment status.  Because, when viewed in the totality, the undisputed evidence clearly demonstrates that plaintiff was an at-will employee, defendant's

17

motion for summary judgment regarding plaintiff's claim for
breach of contract is GRANTED.[13]

**B.    Breach of the Implied Covenant of Good Faith and Fair
        Dealing**

Plaintiff also claims that the alleged implied employment
contract contained an implied covenant of good faith and fair
dealing, which was breached by defendant's discharge of plaintiff
without good cause.  (Compl. ¶¶ 26-29).  Defendant asserts that
this claim must fail because, as a matter of law, there was no
implied employment contract that modified plaintiff's at-will
employment status.

The California Supreme Court has noted that "with regard to
an at-will employment relationship, breach of the implied
covenant cannot logically be based on a claim that the discharge
was made without good cause." Foley, 47 Cal.3d at 699 n.39.  The
Foley court noted that to interpret otherwise would transmute all
at-will contracts "into contracts requiring good cause for
termination and Labor Code section 2922 would be eviscerated."
Id.  The Supreme Court recently reaffirmed this position, stating
that "because the implied covenant protects only the parties'
right to receive the benefit of their agreement, and, in an at-
will relationship there is no agreement to terminate only for
good cause, the implied covenant standing alone cannot be read to
impose such a duty." Guz, 24 Cal. 4th at 350.

---

[13]    Because plaintiff could not raise a triable issue of
fact regarding the existence of an implied contract, defendant
was at liberty to discharge plaintiff for any reason or no
reason.  Davis, 29 Cal. App. 4th at 369.  Therefore, the court
need not reach the issue of whether there was good cause to
terminate plaintiff.  Id.

1     As set forth above, in this case, the undisputed evidence

2 demonstrates that there was no implied employment contract

3 between plaintiff and defendant and that plaintiff was an at-will

4 employee.  Therefore, plaintiff does not have a claim for breach

5 of the implied covenant of good faith and fair dealing allegedly

6 encompassed within that contract.  As such, defendant's motion

7 for summary judgment regarding plaintiff's claim for breach of

8 the implied covenant of good faith and fair dealing is GRANTED.

**C.  Retaliation**

10     Finally, plaintiff claims that defendant wrongfully

11 terminated him in retaliation for hiring an attorney.  Defendant

12 asserts that this claim must fail because the decision to

13 terminate plaintiff was made prior to defendant's knowledge that

14 plaintiff hired a lawyer.

15     The California Supreme Court has held that "an employer's

16 right to discharge an at-will employee is subject to limits that

17 fundamental public policy imposes."  <u>Green v. Ralee Eng'g Co.</u>, 19

18 Cal. 4th 66, 71 (1998) (citing <u>Tameny v. Atlantic Richfield Co.</u>,

19 27 Cal.3d 167, 172 (1980)).  "[A]t will employees may recover

20 tort damages from their employers if they can show they were

21 discharged in contravention of fundamental public policy."  <u>Id.</u>

22 Fundamental public policies are delineated in constitutional,

23 statutory, or regulatory provisions.  <u>Id.</u> (citing <u>Gantt v. Sentry</u>

24 <u>Ins.</u>, 1 Cal. 4th 1083, 1095 (1992)).  As such, a plaintiff

25 seeking to press a claim for wrongful termination in violation of

26 public policy must point to a constitutional, statutory, or

27 regulatory provision that advances general social policies, which

28 has been violated by the defendant's conduct.  <u>Foley v.</u>

19

Interactive Data Corp., 47 Cal.3d at 669; see also Green, 19 Cal. 4th at 81.

To establish a *prima facie* case of retaliation, a plaintiff must prove (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the two. Raad v. Fairbanks North Star Borough Sch. Dist., 323 F.3d 1185, 1196-97 (9th Cir. 2003). If plaintiff is able to assert a *prima facie* retaliation claim, the "burden-shifting" scheme articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies. See Akers v. County of San Diego, 95 Cal. App. 4th 1441, 1453 (2002) (applying the McDonnell Douglas burden shifting analysis to plaintiff's state law claim for wrongful discharge in violation of public policy); Patten v. Grant Joint Union High Sch. Dist., 134 Cal. App. 4th 1378, 1384 (2005).

Under McDonnell Douglas, once a plaintiff makes out a prima facie case of retaliation, the burden shifts to defendants to set forth a legitimate, non-retaliatory reason for the adverse employment action. See Stegall v. Citadel Broadcasting Co., 350 F.3d 1061, 1066 (9th Cir. 2003). If defendants can make this showing, plaintiff must demonstrate that the reason is a pretext for retaliation. Plaintiff may demonstrate pretext in one of two ways: "(1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." Chuang v. Univ. of Calif. Davis, Board of Trustees, 225 F.3d 1115, 1127 (9th Cir. 2000). The factual inquiry

20

regarding pretext requires a new level of specificity.  <u>Texas</u>
<u>Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 255 (1981).
Plaintiff must produce *specific* and *substantial* evidence that
defendants' reasons are really a pretext for discrimination.
<u>Aragon v. Republic Silver State Disposal, Inc.</u>, 292 F.3d 654, 661
(9th Cir. 2002); <u>see</u> <u>Martin v. Lockheed Missiles & Space Co.</u>, 29
Cal. App. 4th 1718, 1732-33 (1994) ("[T]o meet an employer's
sufficient showing of a legitimate reason for discharge the
discharged employee, to avert summary judgment, must produce
*substantial responsive evidence* that the employer's showing was
untrue or pretextual.") (emphasis added) (internal quotations
omitted).

Defendant contends that plaintiff cannot establish a *prima*
*facie* case of retaliation because he has failed to tether his
claim to a constitutional, statutory, or regulatory provision
that advances general social policies, which has been violated by
the defendant's conduct.  Moreover, defendant contends that even
if Anderson has proffered evidence sufficient to support a *prima*
*facie* case, plaintiff cannot demonstrate defendant's reason for
terminating plaintiff was a pretext for retaliation.

Assuming *arguendo* that plaintiff has set forth a prima facie
case by identifying a protected activity,[14] an adverse employment
action in his termination, and a causal connection based upon the
proximity in time between his hiring a lawyer and his actual

---

[14]     Because, as set forth *infra*, the court holds that
plaintiff has not met his burden of demonstrating retaliation,
the court need not decide whether hiring a lawyer in conjunction
with an internal sexual harassment complaint and investigation is
a protected activity for purposes of a <u>Tameny</u> claim.

1  termination, defendant has presented evidence of a legitimate,

2  non-retaliatory reason for plaintiff's discharge.  Specifically,

3  defendant presents evidence that Jenson terminated plaintiff's

4  employment because he was concerned about Anderson's treatment of

5  the women from RMCC and whether he could maintain the

6  professional standards of a police officer.  Jenson believed that

7  Anderson's comments and dealings with Young were inappropriate,

8  insensitive, and in violation of EEO policy.  Jenson also

9  believed that Anderson's contacting of witnesses was in direct

10  violation of Slaat's directive.

11      Most importantly, defendant presents evidence that the

12  decision to terminate plaintiff was not based upon Anderson's

13  hiring of an attorney because the termination decision was made

14  prior to any knowledge by defendant or its agents that plaintiff

15  had hired an attorney.  On March 23, 2006, plaintiff's attorney

16  first contacted Slaats via a voicemail message.  It is undisputed

17  that prior to this contact, Anderson had not told anyone at Union

18  Pacific that he hired an attorney or was represented by legal

19  counsel.  Defendant proffers evidence, in the form of an e-mail

20  to Slaats containing a draft of Anderson's termination letter,

21  that defendant's decision to terminate plaintiff's employment was

22  made by March 22, 2006, one day prior to the contact from

23  plaintiff's attorney.

24      Plaintiff has not presented any specific, much less

25  substantial, evidence to raise a triable issue of fact that

26  defendant's proffered reason for termination is merely a pretext

27  for retaliation.  While plaintiff's burden at the summary

28  judgment stage is not great, he cannot simply rely on

22

1   generalizations and conjecture.  <u>Aragon</u>, 292 F.3d at 661; <u>Warren</u>
2   <u>v. City of Carlsbad</u>, 58 F.3d 439, 443 (9th Cir. 1995); <u>see</u>
3   <u>Martin</u>, 29 Cal. App. 4th at 1735 (holding that speculation as to
4   an employer's motive was insufficient to raise a triable issue
5   regarding pretext).  Plaintiff contends that defendant's
6   assertion that it had already made the decision to terminate
7   Anderson prior to counsel having called and e-mailed "may not be
8   true in view of the fact that plaintiff's termination letter
9   stated that his supposed tampering with an investigation was an
10   aggravating factor in the termination."  (Opp'n at 24).
11   Plaintiff's bald assertion that defendant is lying is not
12   sufficient "specific and substantial" evidence of pretext,
13   particularly considering the evidence proffered by defendant.
14   Plaintiff proffers no evidence to cast doubt on the validity of
15   the March 22 e-mail that contains a draft of Anderson's
16   termination letter.  Further, it is undisputed that defendant
17   knew of plaintiff's attempts to contact witnesses, namely
18   Johnson, Hamilton, and Meyer, prior to March 22, 2006.
19   Therefore, the temporal proximity between the phone call on March
20   23, 2006, and the actual termination of plaintiff on March 24,
21   2006, is insufficient evidence of pretext where the undisputed
22   evidence demonstrates that the decision to terminate was made on
23   or before March 22, 2006, prior to any knowledge by defendant of
24   the alleged protected conduct.[15]  As such, defendant's motion for
25

26        [15]   Moreover, in the sole case cited by plaintiff in the
  discussion of his retaliation claim, the Ninth Circuit noted that
27   "timing, standing *alone*, may be insufficient to raise a genuine
  issue with respect to pretext."   <u>Stegall</u>, 350 F.3d 1061 (9th Cir.
28   2003)

summary judgment regarding plaintiff's claim for retaliation is
GRANTED.

### CONCLUSION

For the foregoing reasons, defendant's motion for summary
judgment is GRANTED.  The Clerk of the Court is directed to close
this file.

IT IS SO ORDERED.

DATED: May 20, 2008.

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE